## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

**v.**

**LUIS ANTONIO BERNARDY-LABOY**

**Defendant**

**Crim. No. 19-306 (ADC)**

### OPINION AND ORDER

Before the Court is defendant Luis Antonio Bernardy-Laboy's ("defendant") motion to suppress, the government's responses, and defendant's replies (**ECF Nos. 20, 22, 24, 25, 26**). Having considered the parties' submissions, and the evidence presented at the suppression hearing, the motion to suppress is **GRANTED IN PART** and **DENIED IN PART**.

**I.    Procedural Background**

**A.  The pleadings**

On May 14, 2019, two Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") agents ("agents") arrived at defendant's residence to question him about certain items defendant had purchased online. **ECF No. 20**. After an initial conversation with the defendant, the agents conducted a warrantless search of his cell phone, room, and motor vehicle (a Toyota truck) finding and seizing several items, including firearms and ammunition. Defendant was arrested by federal agents that same day. *Id*.

On May 16, 2019, a three-count indictment was returned charging the defendant with the illegal possession of a machine gun, being a convicted felon in possession of a firearm and ammunition, and being a drug user in possession of a firearm and ammunition, all in violation of 18 U.S.C. §§ 922(o), 922(g)(1) and 922(g)(3). **ECF No. 10.**

On August 9, 2019, the defendant filed a motion to suppress asserting that any statements and items seized must be suppressed as obtained in violation of the Fifth and Fourth Amendments. **ECF No. 20**. In sum, defendant argues that "the acts of the investigating officers searching [defendants]'s phone, home and car, interrogating and detaining were flatly inconsistent with constitutional protections." *Id* at 14-15. Because of the Government's infringement of his constitutional rights, defendant requests that statements and "any evidence gathered as a result of [the officers'] activities warrants [] suppression" as well. *Id*.

Defendant's main argument hinges on his claim that his interrogation on May 14, 2019 was "custodial" and, as such, all constitutional safeguards attached. **ECF No. 20** at 1-2, 5. Defendant asserts that having requested counsel, the interview should have come to a complete stop. *Id*. However, according to defendant, the agents continued interviewing and searching through defendant's cell phone, specifically his text messages. *Id* at 5. The agents' found texts with attached photos that constituted incriminating evidence relating to firearms, which led the agents to request defendant's consent to search his room and vehicle. *Id*. Defendant claims that he refused consent to the search of his apartment and specifically requested the agents to secure a search warrant. *Id*. Finally, defendant argues that all evidence seized from his house, vehicle,

and cell phone is excludable as fruit of the poisonous tree because it was all obtained as the result of an illegal custodial interrogation during which defendant requested counsel and refused to the search of his apartment. *Id* at 14-15. While defendant acknowledges that his apartment is located within his mother's house and that she appears as the registered owner of the vehicle, he nonetheless asserts that his mother did not have authority to consent to the warrantless searches of the house and vehicle, in light of defendant's explicit objections. *Id*.

On August 21, 2019, the Government filed a response. **ECF No. 22.** At the outset, the government argues that defendant was not subjected to custodial interrogation when initially interviewed by the agents and highlights that the interview took place at defendant's home, defendant was not handcuffed, his mother was within reach, and he was able to move freely and even got to use his cell phone. **ECF No. 22** at 1. Not being subjected to custodial interrogation, the government asserts defendant was not entitled to counsel. Alternatively, the government asserts that even assuming defendant was in "custody" and had a right to invoke counsel, the only time he did so was after having consented to a partial or limited search of his phone (only consented to the review of text messages and withheld consent to the search of photos) after being questioned in connection with some photos found within his text messages. **ECF No. 22** at 8. The government also argues that even at such point, defendant explicitly waived his constitutional rights (to remain silent and to counsel) by asserting that he would continue speaking to the officers even after requesting counsel in relation to the search of photos within his smartphone. *Id*. Furthermore, the government argues that defendant's mother, who

appears as registered owner of the house and defendant's vehicle, provided written consent for both searches and, consequently, the search of both premises was legal. *Id.*

Finally, the government argues that defendant's motion to suppress minimizes the fact that defendant gave oral and written consent to the search of his cellphone and vehicle, and even if that was not enough, the rule of inevitable discovery should apply in favor of the admissibility of the evidence. *Id.*

Defendant filed a reply. **ECF No. 26**. In order to better assess all the arguments and grant the parties an opportunity to present evidence, the Court held an evidentiary hearing on September 4, 2019.

### B.  The Evidentiary Hearing

At the evidentiary hearing,  the government expounded on the arguments included in its response at **ECF No. 22** and submitted the matter to the Court's consideration based on the pleadings on  record and the transcript of the audio recording of the interview conducted by the law enforcement agents to defendant on May 14, 2019.  **Exhibit 11.**

The defense, on the other hand, argued that the May 14, 2019's statements were made under a custodial interrogation setup. Moreover, defendant asserted that the agents continued defendant's  interrogation despite the fact that defendant invoked his right to an attorney and later proceeded to carry out warrantless searches of the apartment and vehicle , events that led to the seizure of several items, including a weapon. The defense then proceeded to present

defendant's testimony and stipulated to the audio recording of the May 14, 2019 interview along with its transcript.[1]

After hearing arguments from both sides, defendant's testimony, and a careful analysis of the audio recording of defendant's interview by the law enforcement agents, testimony offered at the evidentiary hearing, along with the pleadings and motions, defendant's motion to suppress at **ECF No. 20** is hereby **GRANTED IN PART** and **DENIED IN PART.**

## II.    Legal Standard

### A.  Custodial Interrogation

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination require that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence and assistance of an attorney. *Edwards v. Arizona,* 451 U.S. 477, 481 (1981). By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Miranda v. Arizona,* 384 U.S. at 444.

"After initially being advised of his *Miranda* rights, [an] accused may himself validly waive his rights and respond to interrogation."  *Edwards v. Arizona*, 451 at 484. "We further hold that [an] accused, having expressed his desire to deal with the police only through counsel, is

---

[1]The Court will rely on the transcript and translation submitted by the government (Exh. 11) inasmuch as the translation submitted by the defense (Exh. K) is inaccurate as to a key factor within the legal disputes at hand (whether defendant had demanded for a search warrant or not).

not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id*. at 485.

A suspect's "request for counsel must be clear and unambiguous." *United States v. Oquendo-Rivas*, 750 F.3d 12, 18 (1st Cir. 2014) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "Where a request, marred by ambiguity or equivocation, suggests only 'that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.'" *Id*. at 19 (quoting *Davis*, 512 U.S. at 459)). Courts assess whether a suspect's request "be such that 'a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Id*. (quoting *Davis*, 512 U.S. at 459).

Courts apply a four-part test to determine "whether the resumption of questioning is permissible: (1) whether a reasonable period of time passed prior to the resumption, (2) whether the same officer resumed questioning, (3) whether the suspect received refreshed *Miranda* warnings, and (4) whether questioning concerned the same alleged crime" ("*Mosley* factors"). *Id*. at 17–18 (citing *Michigan v. Mosley*, 423 U.S. 96, 104–06 (1975)) (additional citations omitted). A court also "must account for the totality of the circumstances, with an eye to determining whether the suspect retained the ability to choose whether and when to speak." *Id*. at 18 (citation and internal quotation marks omitted).

### B.  Searches and Seizures

The Fourth Amendment prohibits unreasonable searches and seizures by government agents. *United States v. Dapolitano,* 713 F.3d 141, 147 (1ˢᵗ Cir. 2013).  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451–52, 192 L. Ed. 2d 435 (2015). It further provides that "no Warrants shall issue, but upon probable cause." *Id.* 435 (citation omitted).

The Supreme Court "has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], as *per se* unreasonable… subject only to a few specifically established and well-delineated exceptions.'" *Id.* The Fourth Amendment's prohibition "on unreasonable searches and seizures is enforced through the exclusionary rule." *United States v. Camacho*, 661 F.3d 718, 724 (1ˢᵗ Cir. 2011).

"Longstanding precedent… carves out an exception to the warrant requirement for consensual searches" when consent is "validly obtained and voluntary." *Pagán-González v. Moreno*, 919 F.3d 582, 590 (1st Cir. 2019) (citation and internal quotation marks omitted). Consent is "a jealously and carefully drawn exception to the warrant requirement." *Id.* at 591 (citation and internal quotation marks omitted). "The government thus fittingly bears the burden to prove valid, voluntary consent…. "*Id.* (citations omitted). Court engage in a "totality-of-the-circumstances review," "taking, into account, where appropriate any evidence that law

enforcement officers' fraud, deceit, trickery or misrepresentations prompted defendant's acquiescence to the search." *Id.* (citations omitted).

"Common authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes...." *Id.* "The burden of establishing that common authority rests upon the State." When the prosecution seeks to justify a warrantless search by proof of voluntary consent it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *United States v. Matlock,* 415 U.S. 164, 172 (1974).

### III.    Analysis

####     A.  Findings of Facts

The Court begins by setting forth the facts as determined from the contents of the audio recording of the May 14, 2019 events and its transcript, the undisputed pleaded facts and defendant's testimony. [2]

---

[2] Considering the fact that during the evidentiary hearing defendant's counsel emphasized the importance of the voice "inflections" of the participants at the May 14th interview as captured in the audio recording (Exh.11), the Court listened to the Spanish language audio submitted by the defense. After listening to the Spanish audio recording, aside of noting voice inflections, the Court noted grave and substantial errors in the transcript of the audio recording submitted by the defense (Exh. K), which are discussed elsewhere in this Order. Accordingly, finding it more accurate and beneficial to defendant, the Court herein relies on the transcript of the audio recording submitted by the Government, (Exh. 11).

### 1. Defendant's Testimony

Since approximately 2017, defendant "has been living in his mother's house" located at Street 12, Z-85, Turabo Gardens, Puerto Rico. **ECF No. 20** at 2. According to defendant's testimony at the evidentiary hearing, his mother, Mrs. María Laboy (Mrs. Laboy) is the registered owner of the house that has been divided into two separate "apartments". Defendant testified that there is a common door or entrance at street level (Exh. A), that leads to a common area described at the hearing as a "living room" or a "balcony". (Exh. E) Once access is gained into this common area, both apartments have independent entrances: a security door at defendant's apartment at the rear right and the door to his mother's apartment at the left. (Exh. C, C-1, C-2). The apartments do not connect from its interior as there are no connecting doors. The only way to access the entrance door of each apartment is by going through the common living room. **ECF No. 79** at 34-40. The house only has a carport which defendant may access by entering his mother's apartment and passing through her kitchen area. (Exh. I) .

Defendant conceded that he does not designate his "apartment" as a separate apartment for purposes of postal, water or electric power services. Nonetheless, defendant testified that his mother does not have access to his apartment and does not enter his apartment unless he is present. His mother does not keep any personal belongings within his apartment, and while true that his mother helps him doing his laundry, he takes his clothing to and from his mother apartment. Defendant asserts he is otherwise responsible for the maintenance and cleaning of his apartment. **ECF No. 79** at 59-61.

Prior to the arrest, defendant was gainfully employed at Caribbean Cinemas at Plaza Las Américas Mall and worked a shift that ended at 10:00p.m. which allowed for his arrival home by 11:00 p.m. (**ECF No. 79** at 41-42).

On May 14, 2019, the agents drove up to defendant's address. **ECF No. 20** at 2**.** Defendant's mother, Ms. Laboy, woke him up and informed him about the presence of some law enforcement officers that wanted to talk with him. **ECF No. 79** at 42. Defendant got up and went outside his apartment through the common area and opened the door to the house. Exh. A. As the agents came in, they sat on a sofa located within the living room or common area. Exh. E. According to defendant's testimony, the agents wanted to ask him questions regarding some "purchases through the internet" **ECF No. 79** at 43. Ms. Laboy remained close by, but within her apartment while the agents talked to her son. *Id* at 47. Defendant sat on the sofa. One agent sat next to him and the other sat right in front, "knees almost touching". *Id* and Exh. E. Defendant testified he was asked questioned regarding his internet purchases, was asked for authorization to search his cell phone, his apartment, and the vehicle. The record reflects that while the questioning began there were at least three (3) agents at the residence. Nonetheless, as time went by, and prior to the search of the apartment and vehicle, the number of agents within the premises had increased,. probably to five or seven, including state officers. **ECF No. 79** at 49-52. The best and most accurate account of the conversation that ensued between law enforcement agents and defendants is that of its audio recording made by law enforcement agents. (Exh. 1, audio recording and Exh.11, transcript). The record reflects that the agents turned on a recording

device around 1:40 p.m., and the recording concluded approximately 28 minutes later.  At the inception, defendant was advised he was a suspect of having conducted some illegal purchases through the internet and that federal charges may be filed against him. At that point, defendant reacted by saying he did not understand, and the agents asked to be allowed to explain him his constitutional rights. Defendant was so advised. Exh. 11 at 1-2. Defendant proceeded to place his initials next to each paragraph explaining his rights within a Notice of Rights Form acknowledging he understood them. *Id* at 2-3 and **ECF. No. 22-1,** Notice of Rights and Waiver. Then the agents asked defendant whether he agreed to talk to them, and defendant replied in the affirmative. Exh. 11 at 3. Defendant proceeded to sign the waiver portion within the Notice of Rights Form.

The agents went on to question defendant on the items purchased and urged his cooperation with the investigation while explaining that even if he did not know, he was "buying a device[3] [a chip], that is illegal under federal law." *Id* at 5-6. Agents informed defendant they already knew he had done the purchases using his credit card, his email and mailing address. Exh. 11 at 6. The agents asked defendant about the person who bought the device from him or for whom he had bought it, his whereabouts, how much was paid for the device, etc. Id. At that point, defendant explained certain details regarding the whereabouts of the items he purchased online for a third party. He admitted having bought the first one for someone he had met and socially shared with; known to him by the nickname of "Prieto." He bought a second

---

[3] Referring to a machinegun conversion device also known as a "chip."

device some time later, at the request of the same person. Admittedly, the devices were bought

"from different pages" (websites) at a cost of $25. Defendant explained he never profited from

the sale. *Id* at 7-10. The agents asked if defendant had been in recent contact via phone with the

third party. Defendant answered in the negative indicating that they did not communicate by

phone but rather talked when they met in person. *Id* at 10.

"To corroborate that information," the agents inquired if he would give his consent "to

remove [his] phone?" *Id* at 10. Defendant unequivocally answered: "Yes[,]" and proceeded to

respond the agents questioning by saying "[t]he phone is in my room." *Id* at 10. According to

the content of the audio recording, the agents then asked defendant if he could ask his mother

to grab the phone for him. Defendant called Ms. Laboy aloud. Because Ms. Laboy did not

immediately respond, one of the agents took upon himself to call or locate defendant's mother

and asked for the cellular phone. *Id* at 11. In this regard, defendant testified that when asked for

the phone he attempted to get up from the sofa in order to retrieve it, but he was not allowed to

leave. Instead, the agents suggested to have his mother get the phone.  **ECF No. 79** at 47. These

two sets of events are not contradictory and may well explain the actions that transpired and

are absent from the audio recording sequence.

While Ms. Laboy searched for the phone, the agents continued explaining to defendant

"[y]ou have to give us your consent here." *Id*. Because defendant did not understand English,

the agents translated the following to the Spanish language from what it seems to be a waiver

form the agents carried with them:

I understand that I have the right to refuse to give my consent and that it could… and that… and that a search warrant would have to be issued in relation to the cell phone before any person could verify this property that belongs to you.

I understand that any contraband, evidence of a crime that is found inside… during the search of the device, could be confiscated and used against me in legal proceedings. I understand that I can consult an attorney before a search is conducted. I understand that I can… withdraw my consent to the search of the cell phone during… at any time. If you're not… comfortable or we're doing something… Look, no. That's it. Stop, you have that right. This consent, well, has been given voluntarily without any promises… coercion or… threat…

Do you understand so far? Okay. I have read these… the points above regarding my rights, I understand them, and thus authorize agents of the ATF federal agency to conduct a full search of the property described herein.

*Id* at 12-13.

From the voice inflections in the audio recording the Court was able to identify that defendant became agitated and asserted twice he did not "understand," "what is that." *Id* at 14 and **ECF No. 20** at 13-14. One of the agents intervened and said "Okay. This is what we're going to do. Listen to me." *Id*. Then the agent explained to defendant that there were two ways they could go about searching his cellphone. They could either search the cellphone in front of defendant and hand him over the device immediately after they were finished if "everything is clear," or they could procure a search warrant and take the cellphone with them for a computer-generated extraction. *Id* at 14 -15.[4] The second option, the agents explained, would deprive

---

[4] While on site, no search warrants were secured. The record reflects it was not until after the phone had been seized, on May 15, 2019 that agents applied for a search warrant "out of abundance of caution" and "after having obtained written and verbal consent" for its search from defendant. ECF No. 3 and 3-1.

defendant of possession of his cellphone for a couple of days. *Id*. Defendant showed concern as to loosing his phone and stated "But in… you'll take away my phone here now… do you take the phone away with you?" *Id*. The agents made it clear they preferred to search the phone in defendant's presence and give it back to him or his mother once they finished the search. This approach, the agents said, would allow him to keep the phone. They repeated that withholding consent would deprive him of his phone for an unspecified substantial amount of time. *Id*.

Defendant responded "[l]ook, um…brother, I don't want to… I want an attorney because right now I don't even know where I stand, you understand? (I want) an attorney to tell me what I have to do and that is it." *Id* at 15. One of the agents immediately responded "Alright. No problem." However, a second agent then added: "You are refusing then. There is nothing to sign here. That will be the consent for the cell phone, right?" Defendant simply answered "yes." At this point both agents were addressing defendant. One of them then asked defendant "You are not going to continue talking to us anymore? Defendant once again answered "yes, yes, no problem". *Id* at 16-17. The agents asked if his request for an attorney "would be as to the consent for the cell phone, right?" and whether he wanted to "continue talking" to them or not. *Id*. "Yes. Yes, no problem," defendant responded as to continuing the conversation. *Id*. The agents again asked if his request for an attorney was related to the search of the cell phone or a precondition to continue talking to them. Defendant further explained "[y]es[,] [y]es, because the thing is, there are… a bunch of photos… private photos of mine[.]"

The agents expounded that they only wanted to look at defendant's "text messages" and "contacts," "nobody's going to look at photos here." *Id*. Defendant responded, "oh, well, alright." *Id*. "We're only going to look at the text messages and the contacts," "we're not interested in anything personal of yours," one of the agents added. *Id* at 17. Defendant explained, "[t]hat's why I said… 'I'd better talk to an attorney.' **But conversations? You can search all you want in there**." *Id* (emphasis added). The agents resolved, "[t]hen let's do it. We'll do it in front of you, right here." *Id*. Defendant reiterated, "[w]hat I don't like is the thing with the photos and all that[.]" *Id* at 18.

The agents then began to browse through defendant's text messages and asked defendant about certain text conversations or messages as they were going through them. Defendant explained to the agents the meaning and context of some messages. For example, a text message related to a purchase of a "drum for the Glock 21 .45" was found, which prompted the agents to ask defendant if he had firearms. *Id* at 19. Defendant said he did not but clarified that he once tried to obtain a "license." *Id*.

Thereafter, defendant explained certain photos embedded in some of the messages indicating those were…. "photos from the Internet. The only thing there [are] motorcycles[.]" *Id* at 26. The agents continued to browse through the text messages. As they went on, one of the agents, Agent Jonathan Vega, asked defendant about his work while the other agent intervened with specific case-related questions: do you have a Firearms here?… are you sure? Do you like firearms? *Id*. At this juncture, while the agents tried to sweet-talk defendant through small talk,

the questioning about firearms continued. At this point, the agents found a photo of a firearm among defendant's text messages. At that point, one of the agents stated, "but that has a chip on." *Id* at 25-26. To which defendant reacted with an "Mm-hmm." *Id*. Defendant further asserted that the photos were "screenshots" taken from websites on the internet. *Id* at 26.

The agents, then asked defendant to explain a photo depicting a "workshop." *Id* at 27. Defendant once again claimed those photographs were screenshots from the Internet. *Id* at 28. The agents did not believe the photos were "screenshots" but rather photos taken by defendant himself with his cellphone. *Id* at 28. They asked him if the "workshop" shown in the photos was located in the house. Defendant told them that that was why he did not want the agents to search his cell phone's photographs. Drawing a line between the consent provided by defendant to a search of text messages as opposed to "photographs," one of the agents clarified to defendant "[t]his is messaging… this isn't a photo gallery, these are messages and the photos." *Id*. At this point, the agents' tone turned more sceptical. Defendant was warned to be honest, and if not, they were to talk to his "mom, who is the owner of the house, to give us her consent to check the house." *Id*. If not, the agents assert they would obtain a warrant. Defendant instructed the agents to obtain a warrant three consecutive times. *Id* at 29. The agents then tried to switch to a cordial tone to calm defendant by explaining, once again, that they were only looking through the text messages, which included photos, but they were not searching within the photo gallery application. Three more times did defendant refuse to prove his consent and asked for a warrant. *Id*.

The agents continued to emphasize the distinction between searching texts that had photos and searching the photo gallery; and while doing so; switched into requesting defendant to authorize the search of his room. *Id* 28-30. Defendant firmly told the agents, twice, that they would have to obtain a search warrant in order to enter his room. *Id* at 29-32.[5] Still, the agents opted to ask whether he had anything illegal on the house to which defendant answered in the negative. The agents continued to ask why he did not want to provide his consent or voluntarily offered to have his room searched in his presence. Defendant withheld consent and, again, asked for a warrant. *Id* at 30-31. The agents took it a step further by appraising defendant that if they were forced to get a warrant, they would not allow him or his mother to step into the house, that his mom would be removed out of the house. Regardless, defendant continued with his demand for a warrant. Faced with defendant's reluctance as to the search of his room, the agents asked defendant to sign a consent form related to the phone's search, validating the verbal consent he had previously provided. *Id* at 32-33. Defendant signed the waiver form pertaining to the search of his phone without hesitation. *Id* at 33. One of the agents asked defendant whether he wanted to say anything else. *Id* at 33. Defendant's answer was not audible. *Id*. Immediately after, the recording ended.

---

[5] The transcript submitted by the defense states that defendant responded by requesting the agents to ask his mother ("go get the lady") instead of what he actually did: request a search warrant ("go get the order"). After comparing the original Spanish language audio with the transcript thereof submitted by the defense, the Court finds that the defense's transcript is flawed and mistaken as to this particular issue. Exh. 11.

According to defendant's testimony during the suppression hearing, the agents took approximately three hours in the process of procuring a search warrant for the residence. Meanwhile, several officers arrived at the residence and kept asking defendant if they could search his room. Defendant testified he remained firm in his posture and steadfastly requested a search warrant. In spite the hours that transpired, no search warrant was secured. Defendant testified that while waiting, he did not have access to his cell phone, could not leave the officer's sight, was not allowed to go into his apartment, nor go across the street to buy a soda when he felt his blood sugar was low.

At certain point-not clear from the record, defendant asked to use his cell phone. *See* **ECF No. 79**. The agents handed the phone to defendant. *Id*. During his testimony, defendant did not mention any objection or resistance from the agents in connection with his request to use his cell phone. To the contrary, at that point, defendant was able to call his father to ask for an attorney.[6]

Defendant testified that he was never shown a search warrant for the residence and through out the hearing none was presented. Neither did the government submit a warrant to search the vehicle. Defendant's mother, on the other hand, signed a written consent form for the search of defendant's apartment and vehicle. In the handwritten document authorizing search of defendant's apartment, she indicates to be the owner of the house and that she had access to all the premises, including defendant's room. Ms. Laboy specifically wrote down that she had

---

[6] Defendant did not testify as to what transpired after he asked his father to hire an attorney.

"access to the whole house. I walk freely around the house, including where Luis Bernardy Laboy sleeps." **ECF No. 22-1** at 2.

The agents searched defendant's room finding ammunition and other firearms related items. **ECF No. 20** at 2. The agents arrested defendant. Defendant testified on direct that he was handcuffed before the agents entered his apartment. **ECF No. 79** at 53.  His testimony as to this particular event was not brought into question during cross- examination.[7]

Pursuant to two separate written consents signed by Ms. Laboy and defendant, the agents also searched defendant's truck, where they found and seized a machinegun and other related items. Defendant testified on direct that he could not remember when he signed the consent form authorizing the search of the truck. However, during cross-examination defendant did admit he signed that form on May 14, 2019. He also conceded that he was not threatened by the agents and that the agents did not draw their guns that day. Finally, although there is no evidence explaining when or under what circumstances either defendant or Ms. Laboy provided her consent, the fact remains that she also signed a consent form for the search of defendant's truck, which is registered under her name. **ECF No. 22-1** at 4.

Pursuant to the facts as reflected on the record, the motions, and the testimony, the Court now turns to the analysis of the issues raised by the parties.

---

[7] During his allocution at the evidentiary hearing, Assistant United States Attorney, Sean Murphy, explained that defendant was not handcuffed until "after they searched [defendant's] room" and found the "ammunitions." However, no witnesses were presented to so establish or contradict defendant's testimony.

### B.    The non-custodial nature of the interview

Defendant argues that he was subjected to a "custodial" interrogation during which the agents ignored his request for counsel and that his apartment and vehicle were subjected to illegal searches. **ECF No. 20** at 2.While acknowledging that defendant's interrogation took place within house premises and that he was advised of his Miranda rights, defendants anchors his assertion of custodial interrogation on several factors: a) he was told he was a suspect of an investigation relating the illegal purchase of a device or chip through the internet and that related information such as email, physical address and credit card matched him; b) at all times during the interrogation the agents sat  in close proximity, side and front of him, not allowing him to walk or move around the house premises; c) was not allowed to reach out and get his cellular phone from his apartment; d) defendant was kept over three (3) hours under interrogation and under the agent's constant surveillance not even allowing him to step outside the house to get a soda when claiming his blood sugar levels were low; d) the agent's reports do label and captioned their report as that of a custodial interrogation. **ECF No. 20** at 2and **ECF Nos. 20, 26-1** at 4-5.

In response, the government argues that defendant was not under a "custodial" interrogation and that as such defendant was not entitled to counsel and that the *Miranda* warnings were provided to defendant out of an abundance of caution. **ECF No. 22**. Moreover, the government points to the fact that defendant's request for counsel related to the search of personal photos within his cellular and the search of his room or apartment. *Id*. More so, the

government claims that defendant was allowed to use his phone to call his father in order to get an attorney. *Id*.

As the government correctly pointed out, "[i]n the absence of a formal arrest, a court's determination of whether defendant was in custody hinges on whether there is a 'restraint on freedom of movement of the degree associated with a formal arrest.'" *U.S. v. Infante*, 701 F.3d 386, 396 (1st Cir. 2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98 (2010). In reaching that determination, the Court examines "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Here, defendant sat down with the two agents on what he described as an indoor "balcony." Exh. E, E-1. He was advised of his constitutional rights, the subject matter of the interview and the fact he was a suspect of an illegal action they were investigating and for which he could be criminally charged. Defendant acknowledged understanding his rights by placing his initials next to each and signing the waiver form. **ECF No. 22-1** at 1. Consistent with the implications of the signed waiver, when asked if he was willing to talk to the agents, defendant responded with an unequivocal "yes." Concededly, defendant voluntarily talked to the agents regarding on-line purchases of "chips" or conversion devices, the websites he had utilized, for whom were the purchases done and to whom were the devices delivered, their cost, etc. The duration of the entire recorded conversation indicates that the interview lasted 28 minutes

during which the agents did not draw their weapons, yelled or otherwise intimidated defendant. Though the government asserts defendants mother was nearby and within reach, it is also a fact that at a given point she was out of sight and hearing of defendant, like for instance when one of the agents had to go and locate her while asking for the cellular phone or to get a soda for defendant.

The fact that defendant's initial interrogation took 28 minutes, was held within premises known to the defendant, where his mother was within premises and accessible upon request, without any threats or intimidation posed by the agents may well account for a non-custodial interrogation.[8] During the initial stages of the conversation defendant voluntarily agreed to speak with the agents, have his questions answered and even agreed to turn over his cellular phone. Then the agents wanted to search defendant's cellular phone. At this juncture defendant was once again warned of his rights while being asked for his consent to have the phone searched. Defendant indicated he did not understand and the agents explained the two options under which the phone could be searched, portraying that by consenting to have the phone searched, the phone would not be taken from him; matter that appeared to heavily weigh on defendant's decision. Then defendant asked for counsel to tell him what to do.  At this stage, the dynamics of the conversation changed, and the totality of circumstances point to the fact that the interrogation had turn into a custodial one. The agents did not have weapons drawn but had

---

[8] In *U.S. v. Murdock*, 699 F.3d 665, 670 (1st Cir. 2012), the First Circuit considered several aspects such as "the familiar surroundings, few officers, lack of physical restraint, short time period, and nature of the verbal exchanges" in determining whether the interrogation was custodial or not.

sufficient admissions to have defendant arrested and charged. Defendant had been warned twice of his constitutional rights. Still when defendant requested counsel instead of ending the questioning and getting an attorney, the agents pressured further by inquiring if his statement meant defendant did not want to talk to them anymore. Defendant indicated he would continue talking to them but reiterated his qualms with the search of his phone "because ….a  bunch of photos…private photos of mine that…" he did not want to have reviewed. He raised this concern once again while agents reviewed photos found within his text messages. Nonetheless, the agents were smart enough to draw the distinction between searches of photos within the photo gallery application and those within defendant's text messages. On the other hand, common sense dictates that defendant must have known he had pictures within his text messages at the time.

It is also a fact that by the time the recording ended, the agent's intervention had not ceased. Defendant had ceased to be as cooperative as he was at the beginning, demanded for counsel in numerous occasions, but no arrangements for court appointed counsel were made. It was not until sometime later that defendant was allowed to call his father for him to get an attorney. All the while, additional agents continued to arrive at the premises. At all times defendant was kept at the same sofa under agents sight and was told that in spite of his refusal to consent to the search of the apartment they could get his mother's consent.[9] Defendant was

---

[9] Given the training to which federal law enforcement agents go through, agents must have known that ownership is not the sole requirement.

not allowed to go into his apartment and the tone of the conversation between agents and defendant completely changed.[10] Defendant testified he was arrested after his phone was searched.

The factual scenario and evidence in this case shows that whether defendant was or not under custodial interrogation at the inception of the interview will not alter the outcome. When defendant was initially approached, it remains a fact that he was admonished unequivocally and immediately of his rights. He did not request counsel and agreed to talk to the agents. In doing so, he answered questions on when and how the offense had been committed. He also elicited information on its surrounding circumstances. When asked to authorize the search of his cell phone, which he voluntarily identified and secured for the agents, defendant was warned, once again of his rights and his right to refuse at any point. Defendant gave a conditional authorization to the search (text messages and contacts) and withheld consent to have the photo gallery application searched and requested advice of counsel as to that and the search of his apartment. Thus, even if under custodial interrogation, defendant was properly

_____

[10] At the end of the conversation the agents said: "We wanted to do things as calmly as possible, Luis, but you are a man and I'm a man and we, even though we are police officers, agents… we don't like to be taken by fools and you would not like being taken by fool. It's all right. Now we are going to do the procedure the way we must have to do it." This statement sums up the change in dynamics since the time defendant requested counsel opposed search of his photos and decided not to authorize the search of his apartment. Nonetheless, it is incumbent upon law enforcement agents not only to advise suspects of their constitutional rights but also of safeguarding them once invoked.

advised of his constitutional rights and throughout the most significant part of the interview he waived those rights.

### C.      Search of defendant's cell phone

As discussed before, defendant argues that the warrantless search of his phone was "unreasonable" and, thus, in violation of his Fourth Amendment rights. **ECF No. 20** at 4-5. He argues that law enforcement officers cannot conduct a minimally intrusive search of a cell phone incident to arrest. He goes on to argue that once defendant "unequivocally requested counsel" the agents "could not continue with the interrogation nor searching the phone, eliciting incriminating evidence." **ECF No 20** at 5.

The government opposed by arguing in the first place that pursuant to *United States v. Ellison*, 632 F.3d 727 (1st Cir. 2010) defendant was not entitled to invoke his right to an attorney because he was not in custody. Moreover, the government argues that defendant cherry-picked excerpts of the audio recording in order to take away the context in which defendant's request for a lawyer was made, and that a review of the transcript of the audio recording reflects that he provided his consent to the search of the phone. **ECF No. 22**.

The Court disagrees with defendant's arguments under the line of cited cases relating to searches incident to arrests. First, the search of defendant's  text messages within the phone, which led directly to the firearm photos and, eventually, to the  agent's interests  in searching defendant's apartment and defendant's motor vehicle--where the evidence was found; was not a search incident to defendant's arrest. According to defendant's testimony, he was arrested

after the agents had searched his phone and prior to having his apartment searched. Thus, defendant's arguments supported by caselaw related to searches incident to an arrest, are unavailing here.

Defendant's second argument also misses the mark. Contrary to the arguments at **ECF No. 20**, defendant did not withhold consent to the search of his phone. Instead, according to his testimony during cross-examination, defendant told the agents "that they could check the phone, but I didn't want them to look at the pictures." **ECF No. 79** at 69-70. He also admitted that what the agents did was "look in[to] [his] messages." *Id* at 70. Within those "messages," the agents found conversations "where [defendant] discuss[ed] firearms." *Id*. Defendant was specifically asked whether he "[]ever objected to the agents looking at [his] text messages," to which he answered "no." *Id*. Furthermore, the agents informed him of his rights, including the right to withhold consent before they conducted the search. They also explained that "he was a suspect and that charges may be filed." **ECF No. 20** at 2.

The transcript of the audio recordings evinces that defendant consented to the search of his phone's text messages or text conversations. Specifically, after the agents explained that they wanted to look at defendant's "text messages" and "contacts," defendant responded, "oh, well, alright." Exh. 11 at 16-17. When providing a qualified consent defendant reacted, by stating: "[t]hat's why I said… 'I'd better talk to an attorney.' **But conversations? You can search all you want in there**." *Id* (emphasis added). Defendant reiterated, "[w]hat I don't like is the thing with the photos and all that…" *Id* at 18.

Although the scope of defendant's consent thus far was arguably qualified and murky, his actions further down the conversation demonstrate that he consented to the search of text messages and photos embedded therein. A key factor to this conclusion is defendant's actions. As noted before, defendant explained to the agents the context of some of his text messages. Within those text messages, the agents and defendant noticed several photographs. Defendant voluntarily explained the photos within the text messages. For example, he indicated to the agents "[o]h, yes… I have photos from the Internet. The only thing there is motorcycles[.]" Exh. 11 at 26. The agents then asked if those photos embedded in the messages were taken by defendant. Defendant claimed they were "screenshots." *Id* at 27. At that point, defendant knew or should have known that by allowing the agents to continue searching his text messages the agents would be privy to photos embedded in his text conversations, for which he particularly provided consent. Yet he did not object, revoke his consent or ask for an attorney until after the agents saw photographs of firearms, "chips," and a "workshop." Finally, while true that defendant requested an attorney after one of the agents asked defendant if the workshop depicted in one of the photos was located in the residence, defendant did sign a "consent" form as to the search of his smartphone validating a previous verbal consent after being duly advised of his rights.

Defendant further challenges the search of his phone by arguing that he specifically and unequivocally requested the assistance of counsel at the time the agents requested to search his phone. By doing so, defendant purports, the agents should have halted their efforts to search

defendant's phone. **ECF No. 20**. By continuing with the search, defendant concludes, the agents acted unlawfully.

The Government argues that defendant's request for counsel was not clear or unequivocal and that the defendant was not in custodial interrogation. Nonetheless, the government acknowledges that when the defendant spontaneously started making incriminating statements, he was immediately advised of his *Miranda* rights. The Government further asserts that defendant decided to waive his rights and continued speaking freely without further invoking the right to be assisted by counsel.  It was not until some time after, when the agents were already browsing text messages within the defendant's phone(with defendant's consent), that defendant requested to be assisted by counsel due to his concern about "personal" photos.

As discussed before, defendant admitted he provided consent for the agents to conduct a search of his text messages despite the fact he made a claim for an attorney later on. Specifically, during the cross-examination, he testified "I told them that they could check the phone, but I didn't want them to look at the pictures." **ECF No. 79** at 69-70. However, the record shows this condition was presented after the agents had already found pictures within the texts. Upon further cross-examination, defendant also testified that he did not object to the agents looking at his text messages, which included the photographs defendant now seek to suppress. *Id*.

Therefore, the Court rejects defendant's arguments, and finds that defendant voluntarily continued talking to the agents and did not invoke his right to be assisted by counsel even after the fact that damaging photographs were found within his text messages. Accordingly, the search of defendant's smartphone at his home was done with his consent and was not unreasonable.

An additional consideration supports this Court's holding. Considering the statements[11] lawfully obtained by the agents with regards to defendant's online purchases and possession of machinegun conversion devices (chips), the possession of the firearms, and delivery of the machinegun to a third party, the government had an independent source to obtain a search warrant to search defendant's phone. As a matter of fact, in this case the government did obtain a search warrant for defendant's phone. According to **ECF No. 27**, "[a] search warrant was applied for and granted on May 15, 2019, at 2:50 PM [for] one (1) white and gold Apple iPhone 7+; Model: MNQY2LL/A; S/N: FCLSN0QVHG06; SIM Card: 8901260202 / 778206902 / 60.01 T-Mobile. [] That search warrant was assigned Case No. 19-949 (SCC)." Thus, even if the Court held that the search of defendant's phone conducted on May 14, 2019 was unlawful, the Government had an independent source and channel to conduct the search and would have inevitably discovered the evidence found within the cell phone during the May 14, 2019 interview at defendant's home.

---

[11] Voluntarily offered by defendant post-*Miranda* warnings and pre-request for an attorney.

As pointed out by defendant in its reply at **ECF No. 26**, the inevitable discovery doctrine provides that evidence obtained through "police error or misconduct," *Nix v. Williams*, 467 U.S. 431, 443 (1984), would be admissible if "(i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." *United States v. Crespo-Ríos*, 645 F.3d 37, 42 (1st Cir. 2011) (citations omitted).

Here, the lawful mean of discovery (search warrant) should the May 14, 2019 search be deemed unlawful, was necessarily employed as the Government actually obtained the search warrant. Considering the search warrant was issued with respect to defendant's smartphone and its SIM card, discovery of the text messages as well as the photographs embedded therein would have been truly inevitable. Thus, because the protections against illegal searches and seizure are not harmed, the Court holds that the evidence obtained from defendant's phone would have been discovered by means independent and unrelated to the even if the search of defendant's phone conducted on May 14, 2019.

> **D.        Search of defendant's apartment**

The parties frame their arguments into a single issue: whether or not Ms. Laboy could override defendant's objection to the search of his apartment **ECF Nos. 20, 22** at 8-10. After carefully listening to the Spanish language audio recording, examining the transcript and

translation thereof, along with defendant's testimony during the evidentiary hearing, the Court rules in favor of defendant as to this particular issue.

As discussed before, the first time that the agents verbalized a desire to search defendant's apartment was right after they saw photographs of firearms and a "workshop" within defendant's text messages. Exh. 11 at 26-28. Faced with defendant's unequivocal refusal to consent, his reiterated demands for them to get a search warrant and his request for counsel, the agents asserted "we'll talk to your mom, who's the owner the house, to give us her consent to check the house. If not, we'll make steps to get a search warrant." *Id* (emphasis added). At this point in time, defendant asserted "get the warrant. get the warrant." *Id*. Upon further inquiry from the agents, defendant again reiterated "You get a warrant and check the house." *Id*. Faced with defendant's clear and repeated refusal to provide consent, the agents again conveyed to defendant their belief that Ms. Laboy could provide consent to search the entire house. The government submits the search is valid provided Mrs. Laboy's consent.

The Government's argument upholding the validity of the agents' search is built on the premise that Ms. Laboy, both as owner of the house and defendant's mother, has superior authority and thus could override defendant's objection to the search of his room. In support, the government cites several cases. However, those cases are all distinguishable.

First, the Government heavily relies on *United States v. Casey*, 825 F.3d 1 (1st Cir. 2016). As pointed out by the government, *Casey* "stands for the proposition that the search was valid when defendant's grandparents had apparent authority to consent to search of the entire home,

including the defendant's unlocked bedroom." **ECF No. 22** at 9. The First Circuit further reasoned that "even where a party who gave consent did not have authority to do so, a search is not unlawful if the searching officer had a mistaken—but objectively reasonable—belief the party in fact had the requisite authority." *Casey*, 825 F.3d at 14. While the facts available to the agents during the May 14, 2019 indicated Mrs. Laboy was the owner of the house, it was also known to them that the house had been divided into two separate an independent apartments. It is noted that through out the pleadings and arguments, the government continues to allude indistinctively to "defendant's room" so as to make it comport to *Casey*; but here the evidence shows the existence of separate living quarters.  More so, it remains significant to highlight that in *Casey*, the occupant of the searched room was not present to object the search in the first place.[12]

In another case cited by the Government, *U.S. v. Rith*, 164 F.3d 1323 (10th Cir. 1999), the objecting occupant retracted his request for a search warrant as soon as the law enforcement agents showed him the keys to the house that the owner (objecting occupant's father) previously handed to the agents.[13] Contrary to *Rith*'s change of mind and explicit consent, here, defendant held his ground for approximately 3 hours while the agents allegedly procured a search warrant

---

[12] At the time Casey's grandparents and owners of the house provided consent to search a room, Lashaun Casey was under the Puerto Rico Police Department custody. *See Casey*, 825 F.3d at 8.

[13] When the officers arrived at the Rith home, they encountered Rith on the porch talking to two Midvale, Utah police officers who were conducting an unrelated investigation. Detective Chen indicated Rith's father had informed them that Rith had brought guns into the house and that they were there to search for the guns. Rith told the officers that they could not search the house and he asked them for a search warrant. When Officer Chen showed Rith the house key Rith said, "Okay, come in." *U.S. v. Rith*, 164 F.3d 1323, 1327 (10th Cir. 1999).

that was not obtained, and withheld consent despite multiple requests by several agents and while so doing , insisted in his right to counsel..

The same goes for the *United States v. Block*, 590 F.2d 535 (1st Cir. 1973), cited in the government's response at **ECF No. 22** at 10. In that case, there was no objection from the occupant of the room. *Id* at 551. Thus, it falls outside the scope of the analysis relevant to this case.

Moreover, the government also draws the Court's attention to *U.S. v. Watkins*, 760 F.3d 1271 (11th Cir. 2014) in support. In that case, under the law enforcement agents' assurances that they would not search for the child pornography material he previously admitted having in his computer, *Watkins* did in fact provide at least limited consent for the search of his computer. Here, defendant never provided his consent for a search of his room, not even a partial or limited consent like the one in *Watkins*, 760 F.3d at 1274.

Finally, in support of its theory of the mother's absolute hierarchy at **ECF No. 22** at 10, the government makes reference to *U.S. v. Witzlib*, 796 F.3d 799, 801 (7th Cir. 2015). This case is distinguishable.  In *Witzlib*, however, the Seventh Circuit was very careful in tailoring its opinion and drew a clear line that was not crossed here. In *Witzlib,* the consent provided by the objecting occupant's grandmother (owner of the house) was found superior to her grandson's request for a search warrant only because the search was limited to the basement of the house, which, in the Seventh Circuit's opinion, was a common area for both occupants. "**[I]t would be one thing had the police wanted to search his bedroom**. **To say that the owner of the house could**

**consent to such a search would be [] unreasonable**.” *U.S. v. Witzlib*, 796 F.3d at 801 (emphasis added). The Seventh Circuit further reasoned, “the police wanted only to search the basement, which was no more Witzlib's private space than the living room was. He could not reasonably believe that merely because some of his possessions (the M–80s) were in the basement, his grandmother—the owner of the home—could not authorize a search of it.” *Id* at 801–02. Here, however, the facts are completely different. The consent provided by Ms. Laboy's against defendant's objection was precisely for the search of defendant's apartment, not even a room within the main house.

In this Court's view, this case falls squarely within the scope of *Georgia v. Randolph*, 547 U.S. 103, 115 (2006), which stablishes that “a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.” *Id* at 120. “[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.” *Id* at 122-23.

According to the photographs submitted into evidence by defendant, it is clear that defendant's quarters were separate from his mother's. The photographs show that beyond the common area where the interview took place, the residence was divided into two apartments. Behind the small common area, there are two doors each leading to a different apartment. Defendant's apartment has a separate living room, dinning table, bathroom and kitchen. **ECF No. 79** at 87. Accordingly, after spending almost 30 minutes interviewing defendant in the

entrance's common area, a reasonable officer should have noticed the physical layout division that exists between Ms. Laboy's and defendant's room. Even if they did not, defendant's refusal to consent to the search of his apartment is dispositive.

Moreover, the record is silent as to whether the agents did ask defendant whether or not his mother had control or any sort of authority to enter his room and search his belongings, which the defendant denied on direct and cross-examination. They simply stated that they did not need his consent because his mother's consent would suffice. However, according to *Georgia v. Randolph,* ownership alone is not the determining factor.[14]

Considering the agents' repeated representations, the Court cannot expect a lay person such as defendant or Mrs. Laboy to eloquently challenge the agents' assertions on legal requirements or standards. Defendant, in this Court's view, did enough to object when he repeated his request for a search warrant even after the agents manifested their understanding that they could bypass his request with Ms. Laboy's consent. Defendant did not remain silent in

---

[14] The government alludes to the written consent provided by Mrs. Laboy which includes a handwritten statement that reads: I am the owner of the house. I have access to the whole house. I walk freely around the house, including where Luis Bernardy sleeps." **ECF No. 22-1** at 2. It must be noted that the three first sentences may be true assertions since she may be referring to the house as generally perceived. The statement of "where Luis Bernardy Laboy sleeps," is a line carefully drafted and presumably dictated to Mrs. Laboy to ensure it met legal requirements. Seems illogical for Mrs. Laboy to have referred to where "Luis Bernardy Laboy sleeps" rather than say "where my son sleeps". In any event, defendant's testimony as to the existence of separate living quarters was corroborated by evidence on record, defendant was questioned in cross examination with his mother's statement within the consent form and he denied it. The government presented no rebuttal evidence.

an acquiescence state, instead he voiced his request for a search warrant over and over after the agents', unilaterally decided Ms. Laboy's consent would suffice.

Under the particular facts of this case, the Court finds that *Georgia v. Randolph*, 547 U.S. 103 (2006) is controlling here. Accordingly, the search and seizure of all the evidence obtained from defendant's apartment warrants suppression; and the motion to suppress at **ECF No. 20** is **GRANTED IN PART as it relates to the search of the apartment.**

The Court cannot find that the Government would have otherwise discovered the evidence found in defendant's apartment by independent means under the inevitable discovery doctrine. Considering the fact that defendant clearly refused to consent to a search of his apartment and that his mother consent could not override such objections, the only conceivable legal alternative left for the government would have been to obtain a search warrant for defendant's apartment. However, according to defendant's testimony, once he withheld consent to the search of his apartment and after being informed by the agents that they were in the process of securing a search warrant, and having waited for approximately 3 hours, the warrant was never secured and thus never presented to defendant. Under these circumstances, the government cannot show that discovery of the items within defendant's apartment via a search warrant is, in fact, inevitable. The government had a chance to obtain a search warrant, but it never did. They chose a different path, one that remains legally unfirm. The Court thus refuses to apply the inevitable discovery doctrine here as it "[would] [] sully the prophylaxis of the Fourth Amendment." *United States v. Crespo-Ríos*, 645 F.3d 37, 42 (1st Cir. 2011).

### E.      The search of defendant's vehicle

#### 1. Defendant's consent

Defendant argues that "although the car is in Ms. Laboy's name, [he] is the one that uses

the car" and has an "expectation of privacy in his car." **ECF No. 20** at 8. Therefore, defendant

argues, the evidence found in his car should also be suppressed for the same reasons that render

unlawful the search of his phone and apartment, and as a fruit from the poisonous tree. *Id*.[15] The

defense asserts there was no valid consent for the vehicle's search. **ECF No. 26** at 7.

The government in its response argues that defendant had no reasonable expectation of

privacy over the car because it was registered under Ms. Laboy's name and parked in her garage.

**ECF No. 22** at 11. The government at the evidentiary hearing further argued that even if

defendant  had a reasonable expectation of privacy, defendant as well as Ms. Laboy gave verbal

and written consent (that she consented as owner and he consented as user) to the search, which

led to the discovery of a loaded machinegun in defendant's vehicle. *Id*.

The government met its initial burden by submitting with its response to the motion to

suppress copy and certified translation of the consent form signed by defendant on May 14, 2019

allowing the gents to search his vehicle. **ECF No. 22-1** at 3. The undisputed evidence on record

is that Mrs. Laboy is the registered owner of the vehicle, a 2009 Toyota Tacoma truck.

ECF.No.22-1 at 3. Undisputed as well is defendant's testimony establishing he is the one that

---

[15] Defendant did not properly raise any other argument in support of his request for suppression of the evidenced seized from his car.

since 2009, pays (the loan) for the vehicle, the only one that drives or otherwise uses it, reason for which he had privacy expectations. **ECF No. 79** at 53.

According to the First Circuit "[n]o bright-line rule determines whether a person has a reasonable expectation of privacy in a vehicle[.]" *U.S. v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014)(quoting *United States v. Aguirre*, 839 F.2d 854, 856–57 (1st Cir. 1988). Because of that reason, courts must considers "a number of factors: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." *Id.* " [I]n short," courts "look… to whether or not the individual thought of the place (or the article) as a private one, and treated it as such." *Id*.

The issue of whether defendant consented to the search of his vehicle is a difficult one to determine, given the scant evidence on record and more so, because the facts were not properly developed by defendant. Defendant clearly established his privacy expectations and grounds upon which to challenge the search and seizure of evidence within his vehicle. Exh. 11 at 53. However, instead of tackling the issue head-on, defendant's counsel did not specifically ask defendant any questions regarding the validity of the consent form signed by defendant and how it materialized. Neither did the defense point to any piece of evidence showing defendant's objection to the search, whether direct or implicit. It was during cross-examination that defendant for the first time was asked if he had provided written consent for the search of the

vehicle. In response he stated: "that part I do not remember." Exh. 11 at 74. When confronted with the consent form defendant recognized his handwriting and signature but indicated that the Form had not been explained to nor read or reviewed by him.  *Id* at 75. Defendant did acknowledged however he had been given two documents to sign and having done so.

In light of the testimony and the record, the Court rejects defendant's arguments standing for the proposition that the search of the vehicle was done without his consent. According to the record, both defendant and Ms. Laboy signed consent forms as to the search of the vehicle. While Mrs. Laboy's authorization is not at issue, and if so; would have been easily discounted and disposed of; it remains a fact that defendant recognized his signature in the consent form as admitted in cross-examination. He did not allege being coerced, intimidated, or otherwise forced into signing the consent. Nothing was said as to whether or not he asked the agents to procure a warrant as he so vehemently did for the search of the apartment. Thus, there is nothing on the record suggesting that his consent was not voluntary, more so, after having refused consent for the search of the apartment. Plainly, there is nothing on the record upon which the Court can rely to quash a signed consent form, which signature defendant recognized as his. Thus, the Government met its burden of showing that, although warrantless, the search of the vehicle was consented by defendant.

### 2. Non-poisonous fruit

Defendant also logged a perfunctory argument to exclude the evidence obtained from the vehicle claiming it was a fruit of the poisonous tree. **ECF No. 20**. Defendant specifically argues "it is the fruit from the illegal search of his phone." *Id*.

"[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990). In these type of scenarios, suppression is contingent on the answer to the following question: if "'the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir. 1983) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)) (ellipsis in original); *See U.S. v. Delgado-Pérez*, 867 F.3d 244, 256–57 (1st Cir. 2017). "[A] number of considerations are ordinarily relevant to the taint inquiry—namely, (1) the time that elapsed between the underlying illegality and the later acquisition of the evidence at issue; (2) the presence or absence of intervening circumstances between those points in time; and (3) the purpose and flagrancy of the official misconduct in question." *U.S. v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015).

As discuss at length above, the Court finds that the search of defendant's cell phone was not unlawful. Therefore, inasmuch as the search of defendant's phone was not illegal, the search of the vehicle, which defendant claims is a fruit of the former, is consequently without poison.

The Court now turns to the question of whether the evidence obtained from the vehicle is the poisonous fruit of the illegal search of defendant's room. The Court must evaluate and determine if "the causal link between a prior unlawful search and consent (as voluntary though it may have been) to a subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed." *U.S. v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015)(citing *United States v. Navedo–Colón*, 996 F.2d 1337, 1339 (1st Cir.1993)).

First, the Court notes that defendant remained unyielding in his position demanding that the agents obtain a search warrant if they wanted to search his room. However, the record is silent as to whether he ever asserted that same or even a lesser degree of reluctancy in connection with the search of his vehicle. As matter of fact, defendant never proposed via his testimony that he withheld his consent to the search of his truck or that in any other way he requested a warrant for such purposes.  In a similar fashion, there is no evidence that defendant was induced into signing the waiver form under the understanding that an objection would be futile when faced with the agents' actions in securing his mother's consent. Such evidence would have brought into question the voluntariness of his consent. However, here, defendant merely contends that he does not remember having signed the consent form.

Nothing on the record explains how or when did the agents request to search defendant's truck. Neither does the record reflect that defendant's consent to the search of the truck was in any way affected, influenced, or impacted by the circumstances surrounding the search of his apartment. Absent any evidence from defendant showing otherwise, the Court cannot out of

thin air conclude that the agents search of the truck was the fruit of the unlawful search of defendant's apartment.[16]

In the absence of a factual background, the Court concludes that much like in *United States v. Navedo–Colón*, 996 F.2d 1337, 1339 (1st Cir. 1993), here, too, the search of defendant's phone and the fact that defendant stated he delivered the presumably illegal items to the third party "might well have convinced appellant that refusing consent was pointless, for the [truck] would be [searched] eventually anyway." *Id* at 1339. So, even if defendant's consent to the search of his truck was influenced and thus a fruit of the prior search within his apartment, for which there is no supporting evidence, the Court cannot exclude that reasons other than the unlawful search of the apartment constituted sufficient influence for his subsequent consent.

## IV.    Conclusion

For all the above, the Court hereby orders and finds that:

(i) defendant was initially  not subjected to a custodial interrogation that later turned custodial in nature; and even if subjected to custodial interrogation, he was made well aware of his  constitutional rights  which  he voluntarily waived by  consenting, both oral and written, to continue talking with the agents (about the machinegun conversion device he had purchased through the internet) and provided  partial consent to the search of his phone; his text messages, (which included photos of firearms) and contacts;

---

[16] To the contrary, as briefly stated at the beginning of this section, in its motion to suppress at **ECF No. 20** defendant claimed, "it is the fruit from the illegal search of his phone."

(ii) the warrantless search of defendant's apartment was unlawful pursuant to *Georgia v. Randolph*, 547 U.S. 103 (2006) and thus all evidence obtained therein is hereby suppressed;

(vi) the search of defendant's truck was conducted under his written consent.

Accordingly, defendant's motion to suppress **ECF No. 20** is **GRANTED IN PART and DENIED IN PART.** The evidence obtained and seized from defendant's apartment warrants suppression and is hereby excluded as inadmissible.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 31st day of March, 2021.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**